RECEIVED

SEP 2 6 2005

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| ELLEN SATTERLY | CIVIL ACTION NO. 04-2159 |
| VS. | JUDGE MELANÇON |
| COMMISSIONER OF SOCIAL SECURITY | MAGISTRATE JUDGE METHVIN |

## REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's unfavorable disability finding. Considering the administrative record, the briefs of the parties and the applicable law, it is recommended that the Commissioner's decision be **REVERSED**.

### *Background*

Born on October 25, 1954, Ellen Satterly ("Satterly") is a 50-year-old claimant with a high school education and two years of college credit. (Tr. 20). Satterly has worked in the past as a sales account manager and an executive producer for a video company. (Tr. 20).

On May 8, 1997, Satterly filed an application for disability insurance benefits, alleging disability as of April 26, 1996 due to neck, back, and shoulder injuries, fibromyalgia, closed-head injuries, chronic pain, and depression. Her application was denied initially and on reconsideration, and an administrative hearing was held on April 8, 2003. In an opinion dated July 22, 2003, the ALJ found that Satterly retains the residual functional capacity to perform a significant range of medium work. (Tr. 26). The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner from which Satterly now appeals.

## *Assignment of Errors*

Satterly raises two errors on appeal: (1) The ALJ erred in failing to accord proper weight to the opinions of her treating and examining physicians; and (2) the ALJ erred in assessing her residual functional capacity.

## *Standard of Review*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen, 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

## *Analysis*

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992):

1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2. A person who does not have a "severe impairment" will not be found to be disabled.

3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4. If a person can still perform his past work, he is not disabled.

5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

In the instant case, the ALJ determined at Step 5 that, although Satterly suffers from the severe impairments of fibromyalgia and status-post closed-head injury with depression, she is not disabled because she retains the residual functional capacity to perform a significant range of medium work, limited only by a need to avoid undue job stress or interaction with the public, which includes the jobs of general office clerk and entry level clerk. (Tr. 24-27).

After careful consideration of the record, the undersigned concludes that the ALJ's decision is not supported by substantial evidence.

## I. Medical History

On April 26, 1996, Satterly was involved in an automobile accident in which she hit a vehicle that ran a red light. Satterly was treated at a local emergency room immediately following the accident, where she complained of headaches, blurry vision, right shoulder pain, and pain in her chest from hitting the steering wheel. (Tr. 191-92). Satterly has since stated that she experienced immediate memory problems, and that it took her five hours to remember to contact her family members about the accident. (Tr. 223). Satterly was released from the emergency room the same day.

Satterly claims that, since the accident, she has had problems with her memory and speech, has developed depression and anxiety, and experiences severe and constant pain in her neck. An MRI of Satterly's brain taken on May 13, 1996 was normal, with no remarkable findings, while an MRI of her cervical spine taken on May 14, 2005 was also normal. (Tr. 204-05).

The record shows that Satterly began treatment with Dr. Ralph M. Mancini, a rehabilitation specialist who became her primary treating physician, on May 17, 1996. Since that date, she has continually complained of severe neck pain, which she experiences more on the left side than the right. Specifically, from May 17, 1996 through April 11, 1997, the record shows that Dr. Mancini identified as many as six trigger points of tenderness and reported that Satterly was treated with a combination of Xylocaine and Depo-Medrol on these points. Satterly tolerated all of these procedures well and appears to have gotten relief from the injections, however, she would present soon afterward with more pain. Dr. Mancini diagnosed Satterly with a probable cervical facet syndrome that was not responding to treatment. (Tr. 249-67). He also noted that Satterly was experiencing depression and anxiety. On January 10, 1997, Dr. Mancini reported that Satterly was not capable of working full-time, even with restricted duties, because of her pain and psychological problems. (Tr. 254).

Dr. Mancini referred Satterly to Dr. C. Sue Williams, a neuropsychologist, for an examination on June 28, 1996 to assess her cognitive and emotional status. Dr. Williams administered IQ tests and reported that reported that Satterly obtained a verbal IQ score of 92, a performance IQ score of 100, and a full scale IQ score of 95, which placed her in the average range for her age, (Tr. 226), although Dr. Williams reported that Satterly experienced a moderate

decline in her intellectual status as a result of the accident. Dr. Williams further reported that Satterly showed marked deficits in the areas of mathematic reasoning, verbal problem-solving, and sequencing skills. However, she performed in the bright average to superior range for vocabulary, hand-eye motor speed, abstract visual analysis, and in the average range for her fund of knowledge, abstract reasoning, and attention to visual detail. (Id.). Satterly's results on the Wechsler Memory Quotient was 121, a score that placed her in the superior range. Dr. Williams noted that this score was somewhat inflated given Satterly's high scores for simple functions such as orientation, simple recall, and long-term memory. (Tr. 227). With respect to short-term memory functioning, Dr. Williams reported that Satterly's test results were below average for her age and tended to show distractibility. (Id.). Dr. Williams also reported that Satterly's clinical scales showed elevations of depression, anxiety, frustration, and physical worry, which she stated are consistent with a closed-head injury. (Tr. 228).

Satterly underwent an IME by Dr. John Wayne Cassidy at the request of her employer's workers compensation carrier on September 16, 1996. Dr. Cassidy, a psychiatrist and neurologist, reported that Satterly was alerted and oriented, that her speech was normal though occasionally pressured, and that she had no evidence of formal thought disorder. (Tr. 247). With respect to Satterly's memory problems, Dr. Cassidy stated that Satterly had unusual memory complaints that varied from deficits in well-established semantic memory through episodic working memory, which are inconsistent findings in individuals with mild brain injuries. Dr. Cassidy noted, however, that Satterly did not appear to be malingering on her memory tests. Dr.

Cassidy's impression was that Satterly had hypomania,[1] and he noted that her primary condition was a psychiatric disorder complicating a possible concussive event. (Id.). Dr. Cassidy therefore recommended that the focus of Satterly's treatment be shifted to deal with her emotional problems and that doctors "de-emphasize handicapping conditions presumed to be secondary to a brain injury." (Id.).

Satterly was examined by Dr. Francisco I. Perez, a neuropsychologist, on July 9, 1997, also at the request of her employer's workers compensation carrier. On the Wechsler Adult Intelligence Scale-Revised, Satterly obtained a full IQ score of 97, with a verbal IQ score of 93 and a performance IQ score of 105, which Dr. Francisco stated showed difficulties with numerical reasoning as well as comprehension and sustained attention. (Tr. 299). With respect to memory functioning, Dr. Francisco reported that Satterly scored lower on the Wechsler Memory Quotient he administered (index score of 83) than on the same test administered by Dr. Williams (score of 121). Dr. Perez concluded that Satterly's memory performance was "highly inconsistent" with and "not usually associated with mild head injuries or concussion." (Tr. 299).

Satterly underwent a psychiatric examination by Dr. Jonathan S. Malev on July 24, 1997. Dr. Malev reported that Satterly was alert and oriented in all spheres and had no formal thought defects. Dr. Malev noted that Satterly made a few immediate memory errors on memory tests, particularly in the area of number recitation, but appeared to have good remote and intermediate memory. (Tr. 305). Dr. Malev diagnosed Satterly with major depression and anxiety, and status-

---

[1] Hypomania is a state involving combinations of elevated mood, irritability, racing thoughts, people-seeking, hypersexuality, grandiose thinking, religiosity, and pressured speech.

post closed-head injury with deficits. (Tr. 306). Dr. Malev did not give an opinion regarding functional limitations.

The record also shows that Satterly was treated by Dr. Jeffrey Charnov, an anesthesiologist and pain management specialist, in 1997. On March 11, 1997, Dr. Charnov reported that Satterly's chief complaint was throbbing pain throughout her neck. On April 16, 1997, Dr. Charnov noted that extension and lateral rotation of Sattrely's neck caused increased pain and discomfort. (Tr. 324). Dr. Charnov agreed with Dr. Mancini that Satterly's condition likely presented a cervical facet arthropathy. Dr. Charnov diagnosed chronic cervicalgia[2] and recommended that Satterly undergo cervical fact joint blocks under fluoroscopy in order to evaluate the extent to which her chronic cervicalgia represented mechanical arthropathy and to provide therapeutic relief. (Tr. 324-25). Satterly underwent these procedures on April 16, 1997 and June 30, 1998. (Tr. 322-23 & 312-13). She tolerated both procedures well. (Tr. 317, 321).

Satterly was examined by Dr. Charles N. Aprill, a radiologist, on August 26, 1997, for complaints of neck and headache pain. Dr. Aprill reported that Satterly had a C1-2 joint abnormality and probable rotary dysfunction. He noted that the injury was stable and did not pose a risk of developing paralysis. (Tr. 331). Dr. Aprill referred Satterly to Dr. Steven Rees for conservative care treatment. (Tr. 332).

Dr. Rees examined Satterly on September 9, 1997 and reported that she was alert and oriented, and had good flexion and negative evidence of thoracic outlet signs. (Tr. 392). Dr. Rees noted that Satterly had tenderness to palpation in the levator scapulae with the levator

---

[2] Cervicalgia is defined as pain in the neck that does not radiate outwards. With this condition, the neck muscles are constantly under tension to hold the head up and are therefore often prone to pain through gradual tightening of the muscles which can also result in tearing from sudden sharp movements.

occipital attachments bilaterally, but otherwise had an intact neurological examination. Dr. Rees diagnosed Satterly with chronic cervicalgia with possible facet dysfunction.[3] (Id.). The record shows that from September 12, 1997 through January 28, 1998, Dr. Rees treated Satterly with trigger point injections, which he reported gave Satterly significant relief and increased her range of motion in her neck. (Tr. 379-93). During this time period, Dr. Rees identified as many as twelve trigger points for injection treatment, noting that the injections helped Satterly's pain, but that when they wore off, she had increased pain.

The record shows that Satterly was treated by Dr. Joseph T. Gillespie, an anesthesiologist, from August 1999 through February 2003 for continued complaints of chronic neck pain. Dr. Gillespie initially diagnosed Satterly with cervical myofascial pain with tender trigger points and multiple arthralgias, (Tr. 520-21), but subsequently diagnosed her with fibromyalgia. On May 31, 2001, Dr. Gillespie referred Satterly for an MRI of her cervical spine, which showed a prominent right T3-4 posterolateral disc herniation. (Tr. 491). On March 21, 2002, Dr. Gillespie reported that Satterly has chronic pain syndrome, specifically, cervical myofascial pain with other strong signs of organic brain syndrome which include forgetfulness, depression, and signs and symptoms of anxiety syndrome. (Tr. 485). Dr. Gillespie stated that although Satterly's condition had been fairly well-controlled with trigger point injections over the years, her prognosis was very poor, and he stated that he did not believe her condition would progress much further. (Id.). Dr. Gillespie further stated that he did not believe Satterly would be able to "hold any productive

---

[3] Facet syndrome, or facet joint syndrome, is defined as an irritation of one or more of the joints on the back of the spinal vertebrae. Facet syndrome is most often caused by whiplash and athletic injuries where the spine and/or neck spends a lot of time in extension.

position in any productive environment that will allow her to provide a living for herself and her children." (Id.).

Satterly was examined by Dr. Curtis M. Vincent, a clinical psychologist, on October 17, 1997. Dr. Vincent reported that Saatterly was alert and oriented X4, and further reported the following:

> Assessment of memory functioning revealed no significant deficits in immediate, recent, or remote memory. She was able to repeat a sequence of eight digits and could reverse the sequence of four digits. She scored in the Average Range on this procedure. When presented with a list of four words, she was able to recall all of them immediately. She was able to remember one of the words after fourteen minutes. Her fund of information was fair. She was able to read and write. She had difficulty performing mathematical calculations other than simple addition and subtraction. Her reasoning skills, insight, and use of practical judgment were fair.

(Tr. 348).

On tests administered by Dr. Vincent, Satterly obtained a verbal IQ score of 93, a performance IQ score of 99, and a full IQ score of 95, which suggested intellectual functioning in the average range. (Id.). Likewise, Satterly scored in the average range on memory functioning tests. (Tr. 350). Dr. Vincent diagnosed Satterly with pain disorder associated with both psychological factors and a general medical condition, chronic, as well as adjustment disorder with depressed mood, chronic, and cognitive disorder. (Tr. 351). He further estimated her GAF score (Global Assessment of Current Functioning) at 65.[4] (Id.).

---

[4] The Attorneys' Textbook of Medicine provides the following explanation of GAF scoring:

> The GAF Scale indicates psychological, social, and occupational functioning on a hypothetical continuum from 90 through 81 (absent or minimal symptoms of mental illness) to transient symptoms (scores of 71 through 80) to mild (scores of 61 through 70) to moderate (scores of 51 through 60) to serious (scores of 41 through 50); scores decline with greater degrees of impaired mental health to the point that the patient shows persistent danger of severely hurting self or others or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear

The only consultative examination in the record is that performed by Dr. R. F. Taylor at the request of Disability Determinations Services on December 26, 2001. Dr. Taylor reported that he had received no records concerning Satterly's automobile accident or her treatment for fibromyalgia, and he performed no diagnostic testing of his own. Dr. Taylor concluded that Satterly's examination was "completely normal" and that she had no limitations on work-related activities. (Tr. 481-83).

## II. Opinion of Treating Physicians

Satterly contends that the ALJ improperly discounted the opinions of Drs. Rees and Gillespie, both of whom opined that Satterly is disabled, in concluding that she is not disabled. The record shows that the ALJ found that these physicians rendered conclusory opinions that are not supported by adequate medical findings, and that both doctors "based their opinions on what they felt to be a substantial psychological component of the claimant's limitations," which was beyond their areas of expertise. (Tr. 25). The ALJ also concluded that Satterly's complaints of pain are not credible, because she "displayed none of the indices generally associated with people who suffer from chronic pain such as atrophy, impairment of general nutrition, signs of premature aging or poor overall health." (Tr. 25).

Although not conclusive, an evaluation by the claimant's treating physician should be accorded great weight. Martinez v. Chater, 64 F.3d 172, 175-76 (5th Cir. 1995), citing Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir.1994), cert. denied, 514 U.S. 1120, 115 S.Ct. 1984, 131

---

expectation of death (scores of 10 through 1). A score of 0 is assigned if inadequate information is available.

See Whitzell v. Barnhart, 379 F.Supp.2d 204, 210 (D.Mass.2005).

L.Ed.2d 871 (U.S.1995). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." 20 C.F.R. § 404.1527(d)(2). Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, "the ALJ has sole responsibility for determining a claimant's disability status." Martinez, 64 F.3d at 176, citing Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir.1990). Where there are apparent conflicts in the record between or among medical sources, "the Commissioner, rather than the Courts, must resolve conflicts in the evidence." Martinez, 64 F.3d at 174. Thus, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Martinez, 64 F.3d at 176, citing Bradley v. Bowen, 809 F.2d 1054, 1057 (5th Cir.1987) (citation omitted). However, an ALJ cannot reject a medical opinion without an explanation. Loza v. Apfel, 219 F.3d 378, 395 (5th Cir. 2000), citing Strickland v. Harris, 615 F.2d 1103, 1110 (5th Cir.1980); Goodley v. Harris, 608 F.2d 234, 236 (5th Cir.1979).

In the instant case, the record shows that Dr. Rees diagnosed Satterly with chronic cervicalgia with possible facet dysfunction and identified as many as twelve trigger points for which he administered injections to relieve her pain. (Tr. 379-93). The record also shows that Dr. Gillespie treated Satterly for more than four years for the same complaints, finally diagnosing her with fibromyalgia and concluding that he did not expect Satterly's condition to improve. (Cite). These medical opinions are consistent with those of other examining physicians, including Dr. Mancini, who diagnosed Satterly with probable cervical facet syndrome that did respond to treatment and who identified as many as six trigger points for treatment with

injections, (Tr. 249-67), Dr. Charnov, who diagnosed Satterly with chronic cervicalgia and recommended trigger point injections for pain relief, (Tr. 322-23 & 312-13), and Dr. Aprill, who diagnosed Satterly with a C1-2 joint abnormality and probable rotary dysfunction. (Tr. 331). Clearly, therefore, the opinions of Dr. Rees and Dr. Gillespie are consistent with those of the other examining physicians, and it was error for the ALJ discount their opinions.

Furthermore, to the extent that the ALJ concluded that Satterly's neck pain is not disabling because it is not supported by adequate medical findings, such conclusion was also erroneous. Fibromyalgia is defined as "[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause." The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least 11 of 18 specified sites." Stedman's Medical Dictionary 671 (27th ed.2000). As the court stated in <u>Willoughby v. Commissioner of Social Security</u>, 332 F.Supp.2d 542, 546 (W.D.N.Y. 2004):

> Numerous courts have recognized that evaluating the nature and severity of [fibromyalgia] in the context of social security disability review has proven to be difficult because of its elusive nature and the lack of objective tests that can conclusively confirm the existence of the disease. *See, e.g., Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir.2003); *Harman v. Apfel*, 211 F.3d 1172, 1179-80 (9th Cir.2000); *Kelley v. Callahan*, 133 F.3d 583, 585 n. 2 (8th Cir.1998); *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir.1996); *Preston v. Sec. of Health and Human Servs.*, 854 F.2d 815, 818 (6th Cir.1988). Nevertheless, despite the lack of objective medical screening devices, fibromyalgia is a potentially disabling impairment that can provide the basis for disability insurance and supplemental security income benefits in the appropriate case. *See Green-Younger*, 335 F.3d at 108-109; *Soto v. Barnhart*, 242 F.Supp.2d 251, 256-57 (W.D.N.Y.2003).

In the instant case, the records show that Satterly has consistently sought treatment for chronic neck pain since her accident in April 1996, and that the majority of doctors who have

examined her agree that she suffers from a neck condition that causes pain consistent with the type of accident she was in. All of these doctors have diagnosed Satterly with whiplash-type injuries, including cervicalgia, facet joint syndrome, or fibromyalgia. Furthermore, although Satterly had a normal cervical MRI, her doctors have identified as many as twelve trigger points for tenderness that they have treated with injections to relieve Satterly's pain.

The law of the Fifth Circuit is that pain reaches the level of a disabling complaint when such pain is constant, unremitting, and wholly unresponsive to therapeutic treatment. Francois v. Commissioner of Social Sec., 2001 WL 322194, *11 (E.D. La. 2001), citing Falco v. Shalala, 27 F.3d 160, 163 (5th Cir. 1994). As to a determination of whether a claimant's pain is disabling, the first consideration is whether the objective medical evidence shows the existence of an impairment which could reasonably be expected to produce the pain alleged. Francois, 2001 WL 322194, at *11. Generally, medical factors that indicate disabling pain include limitation of range of motion, muscle atrophy, strength deficits, sensory deficits, reflex deficits, weight loss or impairment of general nutrition, noticeable swelling, and muscle spasm. Id. Other "medical signs" that support a finding that a claimant is disabled include a physician's diagnosis based upon history, symptoms and response to medication.

When there are conflicts between subjective complaints of pain and objective evidence, the ALJ is to evaluate the claimant's credibility. Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991). "How much pain is disabling is a question for the ALJ since the ALJ has primary responsibility for resolving conflicts in the evidence." Carrier, 944 F.2d at 246. This court may not reweigh the evidence. Id., citing Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir.1990).

15

*Conclusion*

Considering the foregoing, it is recommended that the ALJ's decision be **REVERSED** and that benefits be awarded consistent with an onset date of April 26, 1996.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have ten (10) days from receipt of this Report and Recommendation to file specific, written objections with the Clerk of Court. Counsel are directed to furnish a courtesy copy of any objections or responses to the district judge at the time of filing.

Any judgment entered herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA). See Richard v. Sullivan, 955 F.2d 354 (5th Cir. 1992) and Shalala v. Schaefer, 509 U.S. 292 (1993).

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).**

Signed at Lafayette, Louisiana on September 26, 2005.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)